UNITED STATES of America,
Plaintiff–Appellee,

v.

Alberto ANCHONDO–SANDOVAL,
Defendant–Appellant.

No. 89–1553.

United States Court of Appeals,
Fifth Circuit.

Aug. 22, 1990.

Rehearing Denied Sept. 19, 1990.

Christine W. Kelso, Robert J. Perez, Asst. Federal Public Defenders, Lucien B. Campbell, Federal Public Defender, El Paso, Tex., for defendant-appellant.

Richard L. Durbin, Jr., Le Roy Morgan Jahn, Asst. U.S. Atty., Ronald F. Ederer, U.S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before REAVLEY, DUHÉ, and WIENER, Circuit Judges.

DUHÉ, Circuit Judge.

Alberto Anchondo–Sandoval appeals his convictions for importation of marijuana and possession of marijuana with intent to distribute in violation of 21 U.S.C. §§ 952(a), 960(a)(1), and 841(a)(1). He claims the evidence is insufficient for conviction and that prosecutorial misconduct prevented a fair trial. We affirm.

Anchondo–Sandoval crossed the border from Mexico into the United States at the Ysleta Port of Entry east of El Paso, Texas. At the primary inspection point he presented to United States Custom Inspector Fernando Rangel an immigration document and asserted that he had been in Mexico visiting relatives. He had no driver's license and no money on his person. He told Inspector Rangel that he had been in Mexico visiting relatives and was travelling to Phoenix, Arizona where he intended to find employment as a field worker.

Though Anchondo–Sandoval did not appear nervous or intoxicated, the inspector directed him to the secondary inspection station because Anchondo–Sandoval was unable to produce a driver's license and because his vehicle, a 1978 Thunderbird bearing expired Arizona plates, "met a good profile" for closer scrutiny because it was in poor condition and thus could readily be junked.

At the secondary sight Inspector Rangel illuminated the vehicle's interior with a flashlight and noted that the rear quarter panel on the passenger side appeared to be loose. The officer pried the panel slightly open and saw what he believed to be packages concealed in the compartment formed by the quarter panel. Customs Inspector Pete Reyes inspected the panel and concurred with Inspector Rangel's conclusion. The Customs officers ultimately recovered 13 one-pound bags of marijuana which had been secreted in the vehicle. However, there had been no odor of marijuana in the automobile.

Anchondo–Sandoval, who was standing outside the vehicle during the inspection, expressed surprise when informed that marijuana had been found in the car. He advised the officers that he did not own the vehicle and had driven it across the border at the request of a friend. The officers testified that at this juncture Anchondo–Sandoval said nothing about helping the friend and his wife enter the United States unlawfully nor did he offer to help locate them at the planned rendezvous spot.

DEA Agent Steven Robertson arrived at the inspection station and interviewed Anchondo–Sandoval about two hours after the seizure of the marijuana. Anchondo–Sandoval again denied that he knew of the presence of the marijuana in the automobile. He then explained that he was a construction worker from Albuquerque, New Mexico where he lived with his cousin and his cousin's wife. They had given him money and clothes to enable him to travel to Juarez, Mexico by bus. While in Juarez he encountered Elias Molinar and his wife; Elias was the brother of Louis René Molinar, a good friend of Anchondo–Sandoval. Elias told Anchondo–Sandoval that he and his wife were in Mexico visiting relatives though they were not legally allowed to leave the United States because of their immigration amnesty status. Thus Elias agreed to drive Anchondo–Sandoval back to

Albuquerque if Anchondo–Sandoval would drive Elias' automobile back across the border. Elias and his wife planned to sneak across the Rio Grande and meet Anchondo–Sandoval a short distance from the checkpoint.

At this point in the interview Anchondo–Sandoval offered to assist Agent Robertson make a controlled delivery of the vehicle to Elias. Robertson declined the offer due to the two hour delay and to the visibility of the checkpoint from the surrounding area. He believed that even if Elias and his wife had been waiting for Anchondo–Sandoval at the appointed spot, they would have observed the search and fled.

A subsequent search of the vehicle yielded a New Mexico license plate registered to an individual with an Albuquerque address; Robertson was unable to locate a current address for that person. This New Mexico license plate expired in December 1988, one month after the seizure. The Arizona tag displayed on the vehicle at the time of Anchondo–Sandoval's arrest was registered to Louis René Molinar, Elias Molinar's brother. This Arizona tag had expired in July 1988, three months before the events upon which this prosecution was based. Louis René Molinar later informed agent Robertson that he had owned the Thunderbird but had sold it to someone, he could not remember who, in Mexico.

The government charged Anchondo–Sandoval with importation of marijuana and possession of marijuana with intent to distribute. Following a trial by jury, the district judge declared a mistrial because the jury was unable to reach a verdict. A different judge presided over Anchondo–Sandoval's second trial, following which the jury returned a verdict of guilty on both counts. The trial court sentenced Anchondo–Sandoval to 13 months' imprisonment on each count to run concurrently and three years of supervised release; the court also imposed a special assessment of $100.

*Sufficiency of the Evidence*

In reviewing the sufficiency of the evidence, the court views the evidence in a light most favorable to the government and with all reasonable inferences and credibility choices made in support of the jury's verdict. The standard of review inquires whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Kim*, 884 F.2d 189, 192 (5th Cir. 1990); *United States v. Nixon*, 816 F.2d 1022, 1029 (5th Cir.1987), *cert. denied*, 484 U.S. 1026, 108 S.Ct. 749, 98 L.Ed.2d 762 (1988).

■ Conviction for possession with intent to distribute requires proof of (1) knowing (2) possession (3) with intent to distribute. *United States v. Martinez–Mercado*, 888 F.2d 1484, 1491 (5th Cir. 1989). To sustain an additional importation count the government must show that the defendant played a role in bringing the marijuana into the United States from a foreign country. *Id.* The knowledge requirement is the only element about which there is any serious dispute.

■ Possession of or control over a vehicle does not, standing alone, suffice to prove guilty knowledge. *United States v. Martinez–Mercado*, 888 F.2d 1484, 1491 (5th Cir.1989); *United States v. Olivier–Becerril*, 861 F.2d 424, 426 (5th Cir.1988). Thus where the case involves "hidden compartments within a vehicle, reliance should not be placed solely on control of the vehicle" and there should be corroboration such as "circumstances evidencing a consciousness of guilt on the part of the defendant." *Olivier–Becerril*, 861 F.2d at 427. Although this court has expressed an unwillingness "to rely *solely* on control of the vehicle" to affirm a finding of knowledge, the court will sustain a jury's determination if other circumstances demonstrate consciousness of guilt. *United States v. Richardson*, 848 F.2d 509, 512–13 (5th Cir. 1988). *See Martinez–Mercado*, 888 F.2d at 1491. In sum, knowing possession can be inferred from the defendant's control over the vehicle in which the illicit substance is contained if there exists other circumstantial evidence that is suspicious in nature or demonstrates guilty knowledge. *Martinez–Mercado*, 888 F.2d at 1491; *Olivier–Becerril*, 861 F.2d at 426–27.

■ The government concedes that the record contains no direct evidence of Anchondo–Sandoval's knowledge and that the sufficiency issue is "close." Nevertheless, Anchondo–Sandoval made several contradictory statements during his interviews with the Customs and DEA agents which justify a "consciousness of guilt" finding.

When Anchondo–Sandoval first entered the checkpoint he stated that he had been in Mexico visiting relatives or friends, was returning to Phoenix, Arizona, and intended to find employment there as a field worker. He later asserted that he was in Juarez, Mexico to live cheaply while looking for work in El Paso, Texas and that he intended to return to Albuquerque, New Mexico. Furthermore, he later stated that he intended to look for construction work, not field work. It is also curious that Anchondo–Sandoval chose an isolated point of entry 15 miles east of Juarez and El Paso because his intent was to travel westward upon arriving in the United States.

We note Anchondo–Sandoval's contradictory explanations of his motivations for travelling and his intended destinations, his explanation that persons he met by chance in a large city lent him the vehicle in which the marijuana was concealed, and other explanations of events that the jurors could have considered to be inconsistent with common practice. Such inconsistencies in Anchondo–Sandoval's story coupled with possession of the vehicle allow for an inference of his guilty knowledge. *Martinez–Mercado,* 888 F.2d at 1491; *Richardson,* 848 F.2d at 513. The evidence is not insufficient as a matter of law so as to render the jury's verdict improper.

*Prosecutorial Misconduct*

■ Improper comments by a prosecutor may constitute reversible error where the defendant's right to a fair trial is substantially affected. *United States v. Lowenberg,* 853 F.2d 295, 301 (5th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1170, 103 L.Ed.2d 228 (1989). The pertinent factors to consider include: (1) the magnitude of the prejudicial effect of the statements; (2) the efficacy of any cautionary instruction; and (3) the strength of the evidence of the

defendant's guilt. *United States v. Murrah,* 888 F.2d 24, 28 (5th Cir.1989); *United States v. McPhee,* 731 F.2d 1150, 1152 (5th Cir.1984).

Anchondo–Sandoval points to three improper statements made by the prosecutor, contending that reversible error was committed. First, during cross-examination of Anchondo–Sandoval, the prosecutor asked whether Elias Molinar and his wife were going to testify at trial. The court sustained Anchondo–Sandoval's objection to this question; no curative instruction was requested or given.

Second, during rebuttal argument the prosecutor asked rhetorically why Anchondo–Sandoval's cousin and his cousin's wife, with whom he had lived in Albuquerque, did not testify on his behalf because they could have verified "his story about needing work and coming to El Paso." The district judge sustained Anchondo–Sandoval's objection to this argument and instructed the jurors that they were

to consider the evidence that is before this Court, not any that was not presented in this Court. You may infer from the evidence that what was presented in this Court and the attorney—all the attorneys can argue and ask you to infer reasonably from the evidence that is before you. But what is not before you is not for your consideration.

However, the court denied Anchondo–Sandoval's request for a curative instruction on the burden of proof.

Third, during closing argument the prosecutor emphasized that the witnesses' and Anchondo–Sandoval's credibility were crucial issues in the case and commented, "I am going to tell you my feelings in this case—the defendant in this case is one of the most artful liars I have ever met." The trial court sustained Anchondo–Sandoval's objection to this statement and instructed the jury, "[w]hat the attorneys believe personally is totally irrelevant. The attorneys may however argue from the facts in this case."

■ Anchondo–Sandoval points to the first two improper comments as having im-

permissibly shifted the burden of proof. The well-settled rule in this Circuit is that drawing any inference from a party's failure to call a witness equally available to both sides is impermissible. *United States v. Iredia,* 866 F.2d 114, 118 (5th Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 3250, 106 L.Ed.2d 596 (1989). He argues that the third statement violates the long-standing rule that a prosecutor may not interject his personal opinion concerning the merits of the case or the credibility of a witness. *United States v. Morris,* 568 F.2d 396, 402 (5th Cir.1978). The government concedes that the statements to which Anchondo–Sandoval objected were improper. The ultimate question for this court is "whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict." *Iredia,* 866 F.2d at 118 (citing *United States v. Jones,* 839 F.2d 1041, 1049 (5th Cir.1988)).

■ We take this occasion to again stress that "we do not approve of comments reflecting on the lack of evidence presented by a defendant in a criminal case … Such a course of action is a parlous one at best, of necessity sailing close to implying that the defendant is obligated to produce evidence of his innocence." *Iredia,* 866 F.2d at 118 (quoting *United States v. Soudan,* 812 F.2d 920, 930 (5th Cir.1986). Furthermore, even the most inexperienced prosecutor should be aware that it is improper and highly inappropriate to interject his or her personal opinion of the defendant's veracity into the decision-making process. The use of such tactics is inexcusable and causes this Court to view with a jaundiced eye convictions obtained where such obviously inappropriate methods have been employed. In no less than seven prior opinions in cases prosecuted in the Western District of Texas this Court has pointed out the need to studiously avoid such tactics. *United States v. Garza,* 754 F.2d 1202, 1204–06 (5th Cir.1985); *United States v. Dorr,* 636 F.2d 117, 120–21 (5th Cir. Unit A 1981); *United States v. Rodarte,* 596 F.2d 141, 146 (5th Cir.1979); *United States v. Edwards,* 576 F.2d 1152, 1154–55 (5th Cir. 1978); *Morris,* 568 F.2d 396, 400–02 (5th Cir.1978); *United States v. Corona,* 551 F.2d 1386, 1388–91 (5th Cir.1977); *United States v. Diharce–Estrada,* 526 F.2d 637, 741–42 (5th Cir.1976). Perhaps it is time once again to call to the prosecutor's attention the particularly sensitive roll played by the government attorney and once again we choose to do it in Justice Sutherland's marvelous prose in *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935):

> The United States is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. 295 U.S. at 88, 55 S.Ct. at 633.

■ Though improper, however, the prosecutor's comments are not so egregious as to rise to the level of reversible error because Anchondo–Sandoval's substantial rights were not affected. *Iredia,* 866 F.2d at 114. Whatever prejudice may have resulted from the improper comments should have been neutralized by the court's instruction. The trial court gave proper cautionary instructions following the prosecutor's remarks, and the general instructions to the jury at the close of argument underscored the government's burden.

For the foregoing reasons, Anchondo–Sandoval's conviction is

AFFIRMED.